In this suit a father and mother are seeking to recover damages for the death of their nineteen year old son, Carroll Keowen, who was killed in an automobile collision on Sunday, May 28, 1939, at about 12:30 o'clock in the afternoon. The demand is for the total sum of $27,700, and is made in solido against Albert Fitzgerald and Frank Fitzgerald who compose the commercial partnership known as Amite Sand Gravel Company, owner of the truck involved in the accident, James Turner, the driver of the truck and New Amsterdam Casualty Company, the carrier of public liability insurance on the said truck. The automobile on which their son was riding belonged to him and was being driven at the time, by his brother, Keith Keowen.
The collision occurred on a road known as the Hooper Road, having a gravel surface, at a point where it makes a rather sharp turn from south to northeast and forms a fork with another road which continues directly north known as the Black Water Road. The road which continues on northeast is also called the Hooper Road. This road, before making the curve at the fork, measures about 21 feet in width between ditches on each side and at the end of the curve on the northeast, 24 feet. The opening right at the intersection where the fork is made is much wider and a straight line projected from the beginning of the curve on the south side to the point where it connects with the Black Water Road on the north measures approximately 90 feet. This intersection is approximately 10 miles north of the City of Baton Rouge in East Baton Rouge Parish.
In their petition the plaintiffs aver that on the Sunday of the accident their two sons and several friends were returning home from swimming in the Comite River at a point where it is crossed by the Hooper *West Page 80 
Road. The car which was a Ford Tudor Sedan belonged to Carroll but Keith was driving and Carroll was riding on the left front fender. They were proceeding north on the extreme right-hand side of the Hooper Road at a moderate rate of speed, not in excess of 25 miles per hour, when on reaching a point approximately 20 feet south of the intersection, the gravel truck of the defendant Amite Sand Gravel Company, loaded with 3 1/2 yards of gravel coming west out of the intersecting road, suddenly turned south to its left into the road on which the car was and crashed into its front end. As a result of the collision, they aver, their son Carroll had his left leg torn off at the hip, his left arm broken, a severe cut on the head and suffered other injuries all of which caused his death about a half hour after they had reached Our Lady of The Lake Sanitarium in Baton Rouge where he had been taken immediately after being picked up.
They further aver that their son, Carroll, contributed in no way to the accident which was caused entirely and exclusively through the negligence of the driver of the truck, James Turner, who was acting within the scope of his employment by the Amite Sand Gravel Company, and that of the said company, in the following particulars: (1) In operating an overloaded truck on the highway, making it more difficult to be handled and controlled in traffic; (2) in operating it at an excessive rate of speed said to be 30 miles per hour and not slowing down or stopping before making a left-hand turn on a much travelled highway and (3) in proceeding at a blind corner on the left-hand side of its lane of travel in wanton disregard of the rights of others on the highway.
The defendants filed a joint answer in which it is admitted that a collision occurred at the place and on the date alleged by plaintiffs in their petition between the Ford car being driven by their son, Keith Keowen, and a truck of the Amite Sand 
Gravel Company being driven by James Turner, in which Carroll Keowen was injured and died as a result thereof, but in which otherwise all issues raised in the petition are sharply controverted. We might mention at this time however that it was definitely shown that Turner was, at the time, engaged in the service of his employers and the question of their liability and that of their insurer in the event his negligence is found to be the sole and only cause of the accident, is no longer contested.
In the answer of the defendants it is alleged that Turner was driving the truck going west on the Hooper Road in a careful and prudent manner on the north, or his right side of the road at a speed not in excess of 15 miles per hour and that on reaching the curve at the intersection he did not make a short turn to his left but on the contrary his turn was a long and wide one into the intersection, holding the truck north of the center of the road. That he had thus rounded the curve and had already straightened the truck out and was proceeding south on his right side when he observed the Ford automobile approaching from that direction in the center of the road; that at that moment he was driving at from 12 to 15 miles per hour while the Ford was going approximately 35 miles and although he was on his side of the road and with every reason to believe the Ford would turn to its side so as to meet him in safety, he nevertheless pulled the truck still further to the west side of the road as far as he could but the driver of the Ford, instead of pulling his car to the east, continued down the center of the road and struck the truck a side-swiping blow. The failure of the driver of the Ford car in not paying any attention to the truck, if he saw it at all, and his refusal to turn to the east on his right side of the road, they aver, was the grossest carelessness and negligence on his part which continued to the very moment of the accident and was the proximate cause of the collision and its resulting damage.
In the alternative the defendants plead contributory negligence on the part of the deceased boy in riding on the fender of his automobile and also contributory negligence on the part of Keith Keowen, the driver of the car, all of which negligence is imputable to their parents, the plaintiffs herein, and stands as a bar to their recovery.
The trial of the case lasted several days and a rather voluminous record was made up. The trial judge in an elaborate written opinion, after having analyzed the testimony in detail, reached the conclusion that the accident was caused by the negligence of the truck driver and that the defendants had not sustained their pleas of contributory negligence. He accordingly rendered judgment in favor of the *West Page 81 
plaintiffs and against all defendants, in solido, for the sum of $10,000. A new trial was asked for but refused, the district judge again assigning written reasons, whereupon this appeal was taken.
The vital issue presented, as can be readily inferred from the statement of the case under the pleadings, as herein made, is with regard to the point in the road where the collision actually took place in relation to the curve and also to the east or west side of the road itself. The plaintiffs contend that it was at a point directly or nearly opposite a mail box on the east side of the road right where the curve begins from the south towards the northeast, while the defendants claim that it was on the west side of the road at some distance south of a point on the west side directly opposite the location of the mail box post on the east. The plaintiffs rely mostly on the testimony of eyewitnesses, including six boys who were in the Ford car and survived the accident, whereas the defendants, having produced only the truck driver as an eyewitness, depend principally on physical facts to support their contention.
Besides the two Keowen boys there were five others riding in and on the Ford car. Charles Denham was riding on the right front fender as was Carroll Keowen on the left. Apparently they seem to have been supporting themselves by each placing a leg around the headlight on their respective sides of the automobile. T.F. Carpenter occupied the front seat on the right next to Keith Keowen, the driver. On the rear seat were Jessie Denham in the middle, Richard Carpenter on his right and Gordon Richardson on his left. These boys all lived in the vicinity where the accident occurred and apparently they were all friendly.
They had not all gone out together that morning. Those who had not gone swimming had been shooting at rifle target and met the others at the Comite River bridge some distance south from the intersection in the road. They were invited to ride back home by the Keowen's and boarded the car in the manner just indicated. One of them offered to ride on the left front fender but Carroll insisted that he get inside the car and that he would take that place. As far as their testimony shows the car was being driven at a speed of about 25 miles per hour. Keith Keowen states that he was going about 25 and in this estimate he is supported by Jessie Denham and Richard Carpenter. Charles Denham and Gordon Richardson estimated the speed at from 20 to 25 miles. T.F. Carpenter does not seem to have testified concerning the speed of the car.
All these boys testified that there were numerous obstructions in and around the curve at the fork in the road consisting of sign boards, trees with overhanging branches and shrubbery, all of which made it impossible for a driver of an automobile approaching it from either side to see traffic coming from the opposite direction. Turner himself testified to the same effect and that seems to be an established fact.
The six boys all state most positively that the car was being held to its right-hand side of the road, that is on the east, Keith Keowen, Charles Denham and T.F. Carpenter stating that it was about a foot and a half from the ditch along that side. Not one of them saw the truck until it was practically in front of them and had struck the car at a point which they all fix approximately opposite where the mail box of H.O. Denham formerly stood on the east side of the highway just about where the curve towards the northeast begins. Most of them were positive in their statement that the truck was rounding the curve on the inside and came almost directly in the path of the car and all that some of them had time to do was to cry out, "Look out" or "Pull over."
There was a bus or van occupied by quite a number of negros travelling on Hooper Road going west toward the intersection. The truck passed ahead of this bus at a point which is not definitely fixed according to the testimony of several of its occupants. Two of them, Willie Coleman and Norris Johnson, say that it passed them in front of John Hooper's house which Coleman places some 300 feet from the curve. Johnson says that it is a short distance east of the intersection. Other witnesses who were in the bus, particularly Henry Franklin, the driver, states that the truck passed them at or near a bridge which is shown to be 1950 feet east of the curve. Coleman and Johnson testified as witnesses for plaintiffs, Franklin and three others for the defendants. Some of them estimate the speed of the truck at 35 miles per hour, others say it was going "pretty fast."
Coleman, who was seated on the north side of the bus, facing west, says that after the truck passed the bus it held to its right *West Page 82 
side of the road until it got to the curve. The driver then swung it to the left of the curve and ran into the car. Johnson was seated in the front of the bus near the door on the right. He testifies that after the truck passed them, "it cut short" around the curve and the wreck happened.
Opposed to the testimony of these several eyewitnesses for the plaintiffs, we find that of Turner, the truck driver. The negro passengers in the bus who were called as witnesses for defendants do not claim that they saw the accident and their testimony seems to be relied on for the purpose of impeaching that of Coleman and Johnson, as Franklin makes the direct assertion that it was impossible for any one on the bus to see the collision and that might be implied from the testimony of the others also.
Turner testified as a witness under the hostile cross-examination statute and was never called by the defendants as their own witness. His testimony is that when he got to the curve in the road he slowed down, looked to see if there was traffic approaching from either side, and seeing none "turned out" and shifted into third speed between 12 and 15 miles an hour and as he "got straightened out in the road" he saw the Keowen car coming at an estimated speed of 30 or 35 miles. He cut towards the ditch as far as he could and the crash came.
Defendants also called a witness by the name of J.B. Watts who lives on the west side of the Black Water road more than 200 feet from the point where the Hooper Road curves into the Black Water Road and over 100 feet distant from the Black Water Road itself. Mr. Watts says that he was sitting on his front porch and had a clear view of the intersection except for some sign boards situated on the west side of the Hooper Road and facing that road as it emerges from the west into the curve leading south. He saw the truck coming west when it was past the Hooper house but did not see the actual collision between it and the automobile because his view was then obstructed by the sign boards just referred to. He saw the truck pass between a sign called the Peterson sign and a Coca Cola sign and then lost sight of it. He claims that if the collision had happened on the east side of the road where witnesses for plaintiffs say it did, he would have seen it because that point was directly in his line of vision. To support his testimony to that effect defendants had a civil engineer project on his map or sketch of the intersection two diverging lines from the point Mr. Watts is said to have been sitting on his porch so as to focus his vision on the intersection and the point at which it is fixed is just about where the boys in the car say the collision took place. From this it is implied that Mr. Watts, with his eyes concentrated on the truck, would necessarily have seen the impact had it taken place there.
Realizing, no doubt, that from the standpoint of eyewitnesses' testimony the overwhelming preponderance was against them, the defendants attack that of the boys aboard the Ford car on the ground that it is all so similar, even in slight details, that it had been practically agreed upon before they testified, and that of the two negros, Coleman and Johnson, on the ground that it had been impeached by the other occupants of the bus. Principally however they seem to rely on several physical facts which they contend refute all the direct testimony produced by the plaintiffs.
We are not strongly impressed by the criticism made of the testimony of the six boys who witnessed this terrible accident. Some of them admit that they had talked among themselves about it and what would be more natural after such a fateful event in their young lives. They might also have agreed as to certain facts in discussing it one with another but there is certainly nothing shown by this record which could warrant the assumption that they deliberately planned how they each would testify in the case. In the main they may be said to agree on the more important features of the accident although in some details they differ in certain respects. Much is said about all of them being so certain that the collision took place at a point right near the Denham mail box on the east side of the road. But they all tell how familiar they were with that mail box and it seems natural that in spotting the place of impact they would associate it with some object nearby and that is the one which impressed them all. They do not all pretend that the blow took place precisely in a direct line from the mail box but they do all insist that it was right near that point. In several other matters such as the location of Carroll's body and the places where the truck and the car came to rest after the accident, their testimony is corroborated by that of nearly all the witnesses who came upon the scene immediately after. We are unable to find *West Page 83 
anything in the record to warrant the conclusion that theirs was rehearsed testimony.
With regard to the witnesses Coleman and Johnson, if the purpose of the testimony of the other negros in the bus was to impeach it, the effort, in our opinion, was futile because three of them, Edward Archer, Samuel Gins and Robert Lee Jackson, practically admit that they weren't paying much attention and could only remember either the truck passing the bus or hearing the noise made by the impact. Franklin is the only one who says that it was impossible for any of those in the bus to see the collision. He admits however that the passenger seats in the bus were a foot higher than his driver's seat, and besides that, assuming that the ratio of speed which he fixes between the truck and the bus was correct, at the very most the bus was about 500 feet from the curve as the truck entered it, and from that distance, as appears by a photograph of the locus filed in the record, there seems to be no reason why Coleman and Johnson could not have followed the course of the truck as it rounded the curve.
The testimony of Mr. J.B. Watts is purely of a negative character and the result of certain conclusions on his part which have to yield to the direct testimony of the numerous other witnesses.
After the accident was over the body of the injured boy was picked up at a point near the ditch on the west side of the road about 29 feet south of the Coca Cola sign which is situated right where the curve in the intersection is. The truck came to rest in the ditch on that side of the road about 64 feet further south. The Ford car continued to round the curve and came to a stop near the ditch on the southeast side of Hooper Road as it straightens out towards the northeast, about 25 or 30 feet from the mail box. Blood spots were found on the west side of the road a few feet south of where the boy's body was. Later in the afternoon of the accident other objects described as pieces of torn innertubes, horn screen and broken glass were also seen on the west side of the road. These are the physical facts which defendants so strongly contend support the testimony of Turner, the truck driver, to show that the impact took place on the west or his right-hand side of the road.
Assuming that both vehicles were travelling at about the same rate of speed, the weight of the truck certainly gave it more momentum and it is reasonable to believe that it carried a greater distance after the impact than did the lighter Ford car. So, their respective locations after coming to rest is not determinative of the question on which side of the road the impact actually took place. The location of the injured boy's body some 20 feet south of the Coca Cola sign, tends, in our opinion, to support the plaintiffs' contention that the impact took place at a point in the road nearly opposite the Denham mail box as the mail box is a bit south of the Coca Cola sign and the distance from it to the place where the body was picked up would likely be the distance the force of the impact carried it. That it must have been struck with terrific force is borne out by the fact that the boy's left leg was completely severed from his hip joint and was found dangling from the truck. The presence of the blood spots on the west side of the road furnish no stronger proof that the collision was on that side than does the presence of the boy's body, and the finding of other objects there later in the afternoon afford still less proof on that point because they may well have been moved about by the large number of people who visited and walked around the scene of the accident from the time it occurred until found there by the witnesses who testified concerning them. Besides, we think that it is impossible to account for the manner in which objects are thrown from moving vehicles in a collision of this kind occurring in a curve on a road 21 feet in width.
Tracks made by the wheels of the truck are said to have been observed, and these were marked by witnesses for defendants, leading from a point near the ditch on the west side of the road to the point where it went into the ditch itself. The impression that is conveyed is that these tracks were parallel with the ditch and therefore that must have been the course of the truck before it went into the ditch. But witnesses for the plaintiffs, some of the very first persons to arrive at the scene, testify that they also saw tracks on the road leading to the truck from a point opposite the mail box on the east side of the road. They measured them for as long a distance as 12 feet and state that they ran diagonally across the road.
As important as any other is also the fact shown by the fall of Charles Denham from the right fender at the moment of the impact and his landing on the extreme right-hand side of the road north of the mail *West Page 84 
box, after which he rolled around the curve.
As we view them therefore the physical facts are not by any means entirely in favor of the defendants' side of the case. At any rate they fall far short of overcoming the vast preponderance of positive and direct testimony given by the numerous eyewitnesses all of which leads us to the conclusion, as it did the learned district judge, that the driver of the truck was rounding the curve on the inside which was his wrong side of the road, and ran into the Ford car when it was on its right-hand side.
No negligence, as far as we can see, has been shown against Keith Keowen, driver of the Ford car. He was not driving fast and had the car under proper control being aware of the blind nature of the intersection. His vision was not impaired by the presence of the two boys riding on the fenders and from the manner in which the truck drove around this curve on the inside, the accident could have happened whether they were riding the fenders or not. The same reasoning applies in disposing of the charge of negligence against Carroll Keowen for riding the left front fender, and moreover whilst in doing so he may be said to have assumed the risks incidental to the operation of the car by the one who was driving it, he did not assume the risks of the dangers created by the reckless, careless and negligent driving of the truck which ran into him. The pleas of contributory negligence were properly overruled and plaintiffs are therefore entitled to recover.
Regarding the amount of the award of $10,000 made by the district judge we find no reason to reduce the same. The parents of this deceased boy are well advanced in age, the father being sixty-six and the mother sixty-three years old. They are in poor health and the tragic death of their son was a severe shock to them. He was nineteen years old, was working for the Capitol Stores for moderate wages, from which he contributed regularly to their support, in groceries and other things, on an average of $2.50 to $3 each week. They can recover moreover for their son's own suffering from the time of the accident until he died two or three hours later. He was conscious most of that time and his suffering in the face of impending death was undoubtedly very intense. The grief and sorrow which has come to these parents through the loss of the love and companionship of their boy is one which, due to their advanced years, they will suffer the rest of their lives. By comparison the award made by the district judge is considerably less than the amount of the award in the case of Boykin v. Plauche, La.App., 169 So. 131, for the death of a son of approximately the same age and in which the demand was made by only one of the parents.
The judgment appealed from having been found to be correct in all respects, the same is hereby affirmed at the costs of the defendants, appellants herein.