SAVOY, Judge.
The trial judge, in a well-reasoned opinion, thoroughly discussed and analyzed the facts and the law applicable in the instant case. We, therefore, adopt his opinion as our own, to-wit:
“Plaintiff brings this suit to recover damages for the death of her major son, George Matlock, who expired on July 29, 1961, from injuries sustained on July 28, 1961, when he fell from a Pontiac station-wagon while standing on the rear bumper. The Pontiac belonged to Joe Winborn, but, at the time of the accident, Winthrop Win-born, age 18, the son of Joe Winborn, was driving the vehicle with his father’s permission. For a time before the accident the Pontiac had been pushed by Fate Bolgiano with his pick-up truck in order to start the motor of the Pontiac. Originally named as defendants were Joe Winborn, his public liability insurer, Allstate Insurance Company, and the public liability insurer of Fate Bolgiano, Great American Insurance Company. Before trial, plaintiff voluntarily dismissed her suit against Joe Win-born.
“Plaintiff alleges (Article 7 of her petition) that on the day of the accident (July 28, 1961) Winthrop Winborn had difficulty in starting the Pontiac and he sought assistance from George Matlock and Fate Bolgiano. Bolgiano owned a Chevrolet pick-up truck and offered to help Winborn by pushing the Pontiac with his truck. Bolgiano, accompanied by Matlock and Mrs. Joe Winborn, got into the truck with Bol-giano driving and started pushing the Pontiac westerly on McFarland Street in Leesville, Louisiana. Winthrop Winborn was in the front seat of the Pontiac doing the steering. When the Pontiac reached the point where McFarland Street intersects Tenth Street, in Leesville, Louisiana, the bumpers of the two vehicles would not meet satisfactorily because of the grade of the streets. Matlock then got out of the pick-up truck and stood on the bumper of the Pontiac to depress it so that the bumpers of both vehicles would make contact. Pushing was resumed and after turning north on Tenth Street and going about a half block with Matlock still standing on the rear bumper of the Pontiac, the motor of the Pontiac started. The plaintiff then alleged that Winthrop Winborn, instead of stopping or slowing down after the motor started, ‘stepped on the gas’ causing the Pontiac to leap forward in jerking motions, which caused George Matlock to be thrown to the street, his head striking the asphalt street, resulting in brain injury from which he died on July 29, 1961. Plaintiff alleges that the accident was caused by the concurrent negligence of Winthrop Winborn and Fate Bolgiano. The acts of negligence charged Winborn are:
“(a) In allowing Matlock to stand on the rear bumper of the Pontiac while in motion.
“(b) Permitting Bolgiano to continue to push the Pontiac after completing the turn on Tenth Street, knowing that Matlock was on the bumper.
*486 “(c) By accelerating the motor of the Pontiac after it started causing the Pontiac to leap forward suddenly thereby throwing Matlock off the bumper and on to the street.
“(d) Failing to stop or slow down after the motor of the Pontiac started knowing that Matlock was still standing on the rear bumper of the Pontiac.
“The acts of negligence charged to Bolgiano are:
“(a) Continuing to push the Pontiac on Tenth Street knowing that Matlock was still standing on the rear bumper of that vehicle.
“(b) Pushing the Pontiac at a speed of twenty miles or more per hour while Matlock was standing on the rear bumper of that vehicle.
“(c) Failing to stop, after completing the turn on Tenth Street, to allow Matlock to step down from the bumper of the Pontiac.
“Plaintiff then alleges that she was entirely dependent on her son for support and she seeks damages totaling $32,185.85 for loss of love and affection, loss of support, pain and suffering endured by her son, and medical and burial expenses.
“Allstate Insurance Company answered denying any negligence on the part of Winthrop Winborn and Great American Insurance Company also answered denying any negligence on the part of Fate Bol-giano. In the alternative, both defendants averred that the decedent was guilty of gross contributory negligence in standing or riding on the bumper of the Pontiac which was being pushed; failing to alight when the Winborn vehicle stopped for the purpose of changing drivers; and occupying a dangerous position on the outside of the Pontiac, thereby assuming the risk incident thereto. Allstate also denied coverage, but, in its brief, it has not abandoned that defense.
“The Court has previously denied a motion for summary judgment filed by Great American Insurance Company.
“By stipulation between all parties, it was agreed that Allstate had issued a public liability policy to Joe Winborn covering his 1955 Pontiac and the copy attached to the stipulation was a true copy of the original. Examination of Allstate’s policy shows that it lias a limit of $5,000.00 for injury to one person, and, in addition, contains a medical payments provision with a maximum liability of $500.00. It was also agreed that Great American had issued a public liability policy covering Bolgiano’s 1955 Chevrolet pick-up truck with a limit of $10,000.00 for injury to one person. It was also stipulated that medical and burial expenses incurred in connection with the injuries and death of George Matlock aggregated $2,186.95.
“This Court believes that the following is a fair summary of all the evidence that was adduced on the trial of this case by the witnesses who were present and saw the accident:
“On the day of the accident, the Pontiac stationwagon would not start because the battery was run down, and young Winborn and his mother pushed the car from the yard of their home on to McFarland Street. George Matlock, the decedent, lived across the street from the Winborn home. Fate Bolgiano, the owner of the Chevrolet pickup truck, was visiting his friend Matlock. Winborn sought help from Bolgiano, and it was agreed that Bolgiano would push the Pontiac in an effort to get it started. Bol-giano, Matlock and Mrs. Winborn, the mother of Winthrop Winborn, got into the cab of the Bolgiano truck and Winborn got behind the wheel of the Pontiac. Bol-giano then pushed the Pontiac for a distance of about two blocks up a slight hill to the corner of Tenth and McFarland Streets. As the vehicles approached the *487 intersection, the bumpers of the two vehicles failed to meet because of the grade of the street at that point. Both vehicles then stopped. Winthrop Winborn, his mother, Mrs. Joe Winbom, and George Matlock then got out of the vehicles. Winthrop Winborn and George Matlock then stood on the rear bumper of the Pontiac so that the car would be depressed to a level where the two bumpers would again meet. Mrs. Winbom then got behind the wheel of the Pontiac and the Bolgiano truck pushed the Pontiac around the corner at a slow rate of speed. After the vehicles turned the comer, the road became level again and the bumpers were meeting without difficulty. The two vehicles either came to a stop or slowed to where they were just barely moving. Winborn then alighted from the rear bumper of the Pontiac, walked forward on the left side of the Pontiac, opened the left door, asked his mother to move over and then assumed his position in the driver’s seat so he could steer the car when Bolgiano would commence again to push it. For some reason Matlock remained on the bumper of the Pontiac, though his presence there was no longer necessary. He was standing with his back to the Winborn vehicle and facing the Bolgiano truck. The vehicles then picked up speed, IS to 20 miles an hour, about the same speed at which the truck had been pushing the Pontiac up McFarland Street — and after traveling a distance of about 125 yards from the intersection of the two streets, the motor of the Winborn vehicle caught and the vehicles separated. After the Winborn vehicle had traveled some 40 to SO feet under its own power, Matlock fell from the rear bumper of the Pontiac. His head evidently struck the asphalt road causing brain damage, and he died the next day. The final diagnosis by Dr. P. Bonn, the last attending physician, shows that Matlock had suffered a right acute subdural hematoma and generalized cerebral edema and contusion with brain stem herniation.
“Insofar as Fate Bolgiano is concerned, the evidence does not indicate that he was guilty of any negligence that contributed to Matlock’s death. All of the evidence indicates that Bolgiano was pushing the Pontiac in the usual and customary manner, with continual contact and motion, without sudden bumping, and at a reasonable rate of speed — IS to 20 miles per hour. The evidence also shows that Matlock did not fall from his position on the bumper until the Pontiac had traveled some 40 to 50 feet after the two vehicles had separated and the Pontiac was then operating and traveling on its own power. Nothing that Bolgiano did contributed to the accident. The evidence shows that the Bolgiano vehicle did not strike Matlock; that nothing Bolgiano vehicle did caused Matlock to fall from the bumper; and the Bolgiano vehicle did not run over Matlock after he fell. Matlock had ample opportunity to alight with safety, as Winborn did, from the bumper of the Pontiac when the bumpers of the two cars were again in alignment. Since it is the Court’s conclusion that Bolgiano was not negligent and did nothing with respect to the accident that contributed to it, there will be judgment rejecting plaintiff’s demand against Great American Insurance Company, as was announced by the Court at the conclusion of the trial.
“Now, with respect to Winborn, it is necessary to examine the evidence in more detail. The evidence is undisputed that Matlock was not asked by Winborn or any one else to stand on the bumper of the Pontiac when Winborn himself assumed that position. The action of Matlock in standing on the bumper of the Pontiac was entirely voluntary. After the vehicles had negotiated the turn at McFarland and Tenth Streets, the evidence is also undisputed that the bumpers of the vehicles were meeting as the road was then level, and it was no longer necessary for either Winborn or Matlock to continue standing on the bumper of the Pontiac. Winborn alighted *488 with safety, and he testified that he thought the Pontiac had come to a stop before he .alighted, although that point seems unclear from the evidence. However, it is definite from the testimony of the other witnesses that if the Pontiac had not come to a stop when Winborn alighted, the vehicle was barely moving, for after he alighted Winborn walked forward on the left side of the Pontiac, opened the front door, had his mother move from under the steering wheel to the right, and then he assumed his position in the driver’s seat. The doing of all this by Winborn corroborates the testimony of the other witnesses that the Pontiac was barely moving, if not completely stopped, when Winborn alighted. Why Matlock did not alight from the bumper of the Pontiac at the same time when Winborn alighted will never be known, b.ut it is clear from the evidence that his presence there was no longer necessary, and he could have come down with complete safety since the Pontiac was barely moving. Bolgiano’s vehicle was pushing the Pontiac at about 15 to 20 miles an hour when the motor of the Pontiac caught, and that speed cannot be said to be excessive under the conditions. The evidence -shows that when the motor of the Pontiac caught, there was the usual surge forward incident to the starting of a car being pushed to activate the motor, and there was some acceleration in the speed of the Pontiac, which was normal, but since the Pontiac had gone only some 40 to 50 feet under its own power when Mat-lock fell, there could not have been enough time for the Pontiac to gain much speed. Winborn testified that while he was being pushed his foot was on the accelerator, but the accelerator was not completely depressed. That is normal procedure in attempting to start a vehicle that is being pushed. While the witnesses Bolgiano and Beltz stated that the Winborn vehicle ‘took off’ when the motor caught, and accelerated its speed, yet both of them testified that the movement of the Winborn vehicle when the motor started was not unusual, that it was customary for such vehicles to surge when they are started and that there did not appear to be anything out of the ordinary in the operation of the Winborn automobile after the motor was started. Bolgiano testified further that at no time did Matlock, who was facing him, give a signal of any kind that he wanted to get off the bumper of the Pontiac, or that he protested any movement of either vehicle.
“The evidence also shows that Matlock was a mature grown man, who was 44 years of age at the time of his death, and that he had owned and operated motor vehicles during most of his adult life.
“It is elementary that plaintiff had the burden of proving the acts of negligence which she has charged to Winborn, and considering the evidence as a whole, this Court cannot agree with counsel for plaintiff that she has carried that burden. George Matlock was an ‘out-rider’, and the only duty Winthrop Winborn owed to him was to drive the Pontiac in a careful and prudent manner, and not to be careless or reckless in its operation. The evidence convinces this Court that Winborn did not violate that duty. The speed at which the vehicle was traveling before the motor activated was clearly not excessive, it was not being pushed or driven in an erratic manner, and there was no evidence that there was a sudden turning or swaying of the automobile. While Winborn had his foot on the accelerator when the Pontiac was being pushed, that is normal procedure and most likely the only way the vehicle could have been started under the circumstances. Winborn had not asked Matlock to stand on the bumper, but he voluntarily assumed that position. Winborn did not ask Matlock to remain on the bumper after he alighted. Matlock knew that the purpose of pushing the Pontiac was to get it started, and he had had experience with motor vehicles as owner and driver during most of his adult life. Matlock had ample opportunity to alight from the bumper of the Pontiac with safety, at the same time that Winborn alighted when Matlock’s presence *489 on the bumper was no longer necessary, and while the Pontiac was barely moving, if not stopped. Matlock never indicated by word or sign that he wanted to get off the bumper after the cars had completed their turn on Tenth Street. When the motor of the Pontiac caught, the vehicle surged forward some, which was not at all unusual but expected, and traveled a very short distance — 40 to SO feet — when Mat-lock apparently lost his balance and fell to the pavement resulting in his fatal injury. This Court cannot conclude from the evidence that Winthrop Winborn was guilty of any acts of negligence in this fatal accident.
“Additionally, the evidence reveals that Matlock not only assumed the risk of the very dangerous position he occupied on the rear bumper of the Pontiac, but that he was guilty of gross contributory negligence. Matlock voluntarily placed himself in a position of danger. The very narrow width of the bumper (see defendant’s Exhibit D-6), the fact that Matlock was standing on this bumper with his back to the Winborn vehicle, that the Winborn vehicle was being pushed to start its motor, that the lead vehicle would obviously accelerate its speed after starting, and the fact that there was no reason for Matlock to be on the bumper after the turn at the intersection and he could have alighted with complete safety at the same time that Winborn got down, all add up to a clear case of assumption of risk and contributory negligence on the part of Matlock.
“The jurisprudence of Louisiana appears to be very clear on the rights of ‘out-riders’ on vehicles. A person classified as an ‘out-rider’ assumes such risk as might cause him injury while the driver is operating the vehicle in a reasonable and prudent manner- — that is, he assumes those risks which would ordinarily be incident to his precarious position on the vehicle. Brown v. Waller, 8 So.2d 304 ([La.App.] 1942) and Jones v. Indemnity Company of North America, 104 So.2d 197 ([La.App.] 1958).
“Counsel for plaintiff has cited Jackson v. Young, 99 So.2d. 400 ([La.App.] 1957) as being applicable to the facts of the present case. The Court does not see the applicability. It is obvious from the decision that the driver in the Jackson case requested the plaintiff to assume the dangerous position he occupied on the outside of the vehicle at the time of the accident and further, that the driver of the truck was grossly negligent in its operation by sliding on loose gravel, following which the driver shifted into second gear and accelerated the truck, which caused it to whip around in the loose gravel, throwing plaintiff out of the rear portion that he was occupying. The Court there said:
“ ‘Assuming that the plaintiff in the case at bar was negligent in placing himself in such a precarious position, was this negligence per se, thus rendering him contributorily negligent and barring him from recovery? Had the defendant driven the curve in a reasonable and prudent manner or slowed properly and given sufficient warning that he intended to turn, he would have been guilty of no negligence, whatsoever. If plaintiff had fallen under these circumstances, then he would have assumed the risk of his precarious position on the truck. The facts in the case at bar distinguish it from the cited cases.’
“The Jones case appears to be determinative of the issue of assumption of risk and contributory negligence urged in the present case by the defendants. In the Jones case, plaintiff, a teenage girl, was riding in the rear of a pick-up truck. The plaintiff charged that the driver of the truck was negligent in making unusual maneuvers, resulting in plaintiff’s fall from the bed of the truck. The trial court held that the driver was not negligent. On appeal, the Court of Appeal stated that it was not in full accord with the finding of the trial judge that the driver was not negligent, but it nevertheless held that the issue of negligence on the part of the driver was *490 not material for the reason that plaintiff was obviously guilty of gross contributory negligence and assumption of risk. The following excerpt from the Court’s opinion sums up the jurisprudence:
“ ‘The truck was not equipped with handles or other means of gripping and consequently when Sheila Jo Mitchum stood up in the rear of the truck she should have realized she could not maintain body stability while the truck was in motion. By standing in such a manner in the bed of the truck she unquestionably placed herself in a hazardous position. She had previously been instructed by Mrs. Valentine to seat herself on the floor of the truck and in addition to this warning she had already fallen because of the standing position. She, therefore, knew it was hazardous to ride while standing with no means of maintaining stability and must be held to have assumed the risk incident thereto. See: Brown v. Waller, La.App.1942, 8 So.2d 304. The injuries sustained by Sheila Jo Mitchum were in some measure directly caused by the precarious position in which she placed herself. A passenger, nonetheless, in assuming risk incidental to the operation of an automobile, does not assume the risk of dangers created by the reckless, careless and negligent acts of the motorist. Keowen v. Amite Sand & Gravel Co., La.App., 1941, 4 So.2d 79. A plaintiff passenger in a motor vehicle can be held to assume the risk of a dangerous position therein only when it is found his injuries were the natural consequence of the risk he assumed. * * * '
■“While decisions of other states are not binding upon the Courts of Louisiana, such decisions are persuasive. In Hall v. Ziegler [361 Pa. 228], 64 A.2d 767, defendant’s car became-stalled and, at defendant’s specific request, plaintiff stood on one of the bumpers for the purpose of depressing it so that the bumper of the pushing vehicle could make contact. After the car started while being pushed, the forward car came to a sudden stop as a result of which the plaintiff was thrown to the pavement. In the lower court the jury returned a verdict for the plaintiff, but defendant moved to set the verdict aside and for judgment in its favor, which was granted. Plaintiff appealed, but the Court of Appeal held that the action of the lower court was correct. The following language from the Court’s opinion is appropriate to the case under consideration:
“ ‘ * * * When plaintiff got on Ziegler’s bumper, he could have assumed a position of safety as Fries did. Instead, according to his own testimony, he chose to adopt a position which made it impossible to hold on to anything. As was said in Earll v. Wichser, 346 Pa. 357, 358, 30 A.2d 803, 804: “ * * * where a person chooses a place of danger in preference to one of comparative safety, and by reason of his position is injured, his own act in placing himself in such dangerous position amounts to an assumption of the risk and he cannot recover * m= *»>
In concluding, the Court stated:
“ ‘Giving plaintiff the benefit of every doubt, the evidence proves no more than that he assumed an unncessary risk and that his own conduct was the sole cause of his injury. * * * ’
“And it is the conclusion of this Court that Winthrop Winborn was not negligent, but that Matlock assumed an unnecessary risk, and that his own conduct was the sole cause of his injury and death. Consequently, the plaintiff cannot recover from defendant, Allstate Insurance Company, under the bodily injury provisions of the policy. However, plaintiff is entitled to recover the maximum of $500.00 under the medical payments provision of the policy.”
Counsel for plaintiff, in his brief filed in this Court, contends that either driver, or both of them, had the last clear *491 chance of avoiding the accident, and accordingly plaintiif should recover on this basis.
Apparently this is the first time counsel for plaintiif has advanced this argument. The trial judge did not mention it in his opinion, nor did plaintiif plead the doctrine of last clear chance in her petition filed in the suit in the district court.
In maintaining her position that she should recover on the doctrine of last clear chance, plaintiif cites the case of Prine v. Continental Southern Lines (La.App., 1954), 71 So.2d 716. In the Prine case, supra, a pedestrian was injured when he was struck by a passenger bus of a public carrier. On the specific facts, the trial court and the Court of Appeal allowed recovery for the injuries received by plaintiff. This Court is of the opinion that the case at bar is distinguishable from the Prine case in that in the instant case, all of the elements for recovery under the doctrine of last clear chance are not present.
In Breaux v. Meyers (La.App., 3 Cir., 1961), 132 So.2d 77, this Court held that three elements are necessary to recover under the doctrine of last clear chance, namely:
" * * * (a) plaintiif in a position of peril of which he was unaware or unable to extricate himself; (b) defendant in a position where he actually discovered, or should have discovered, the plaintiff’s peril; (c) at such time that the defendant could have by the exercise of reasonable care, avoided the accident. * * * ” ’ ”
After examining the record, this Court is of the opinion that plaintiif, as a prudent person, if he was in a position of peril in riding on the rear bumper of the Pontiac, should have extricated himself from such position before he suffered the fatal injury. The rider on the same bumper as the decedent was Winthrop Winborn. He alighted from said bumper safely, and there was no need for the decedent to remain on the bumper of the Pontiac because the Winborn vehicle had commenced to operate-, on its own power prior to the tragic accident in the instant case.
Additionally, the driver of the Pontiac could not have reasonably avoided the accident since it occurred almost immediately after the lead car commenced to operate and accelerate on its own power.
For the reasons assigned, the judgment of the district court is affirmed at appellant’s costs.
Affirmed.